IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HOWARD LEBOFSKY                  :        CIVIL ACTION
                                 :
          v.                     :
                                 :
CITY OF PHILADELPHIA             :        NO. 06-CV-5106

## OPINION AND ORDER

Ditter, J.

May 29, 2009

This is an employment discrimination case brought against the City of Philadelphia by a former member of its law department. Plaintiff, Howard Lebofsky, alleges that he was subjected to age, race, and retaliatory discrimination that led to his constructive discharge. Presently before me is the defendant's motion for summary judgment which I will grant.

## I. FACTUAL BACKGROUND[1]

Lebofsky was hired by the law department for the City of Philadelphia as a deputy city solicitor in the special litigation unit on April 8, 1996. Lebofsky's primary responsibility was to defend the city in discrimination and retaliation lawsuits. On July 28, 1998, Lebofsky was promoted to divisional deputy city solicitor in the special litigation unit. Lebofsky was named acting chief deputy of the special litigation unit on January 30, 2000. Lebofsky understood this appointment was for an interim period and that a new city solicitor would have the opportunity to make his own appointment to this position at some time in the future.

---

[1] Where facts are agreed, I have not cited the record; however, if uncontested but not stipulated, I have included a citation to the record. I recount the facts in some detail because in many ways this case has developed differently than when I considered the defendant's motion to dismiss.

In February 2000, Kenneth Trujillo was appointed city solicitor.[2]  Within months, Trujillo announced the merger of the labor unit and the employment functions of the special litigation unit and the creation of a new department, the labor and employment unit.  With this new unit came the creation of a new supervisory position, labor and employment chief deputy solicitor, and the end of the position of chief deputy solicitor for special litigation.  Lebofsky, then age 50, expressed interest in the labor and employment chief deputy position to Trujillo, but Trujillo selected Peter Winebrake, then age 34.  *Plt's Facts* 55-56.  Lebofsky believed Winebrake had little prior experience in labor law, less experience in employment law than Lebofsky, and no supervisory experience.[3]  *Id.* at 69-72.

Shortly after his appointment to chief, Winebrake had a conversation with Lebofsky during which he stated that his goal was to staff the labor and employment unit with "new, young attorneys."[4]  Lebofsky's immediate response to this comment was to advise Winebrake that his statement could be construed as evidence of an intent to engage in illegal age discrimination.  Without delay, Lebofsky took his concerns about this conversation to his supervisor, William Thompson, chief of litigation.  Lebofsky advised Thompson that Winebrake's comment was a "euphemism for bringing in younger people as opposed to older people and in his position he should be aware and attuned to such things."  *Plt.'s Facts* 95.  Within days of this conversation, Winebrake instructed Lebofsky to call his labor and employment clients and inform them that he

---

[2] Mr. Trujillo was forty years old at the time of his appointment and he remained city solicitor until November 1, 2001.

[3] I do not question Lebofsky's belief for purposes of the motion, but as I will discuss, Winebrake's resume and deposition suggest otherwise.

[4] Lebofsky's description of the substance of this conversation, and this specific comment, are denied by the defendant; however, for purposes of this motion the non-moving party's factual assertions are credited.

would no longer be practicing employment law.[5]  Again, Lebofsky discussed Winebrake's comments and conduct with Thompson.

One of Lebofsky's conversations with Thompson was overheard by Donna Mouzayck, the first deputy city solicitor for the law department.[6]  *Mouzayck Dep.* 54.  She characterized the discussion as "small talk" and during the course of the conversation she learned that Lebofsky was unhappy and that he had issues with Winebrake.  *Id.*

Lebofsky did nothing further at this time to assert a discrimination complaint, and in fact, he never filed a written formal complaint concerning Winebrake's actions or any other charge of discrimination, hostile work environment, or retaliation.  Lebofsky does not contend that he asked Thompson to do anything about his concerns, but it is his position that he expected something would be done and nothing was done.  *Lebofsky Dep.* 93, 103-04, 106-07, 110-11, 115, *Aug. 16, 2007.*  It is the warning to Winebrake and the reports to Thompson that Lebofsky contends caused his removal from the labor and employment unit and form the basis of his hostile work environment, constructive discharge, and retaliation claims.

As of August 2000, Lebofsky was no longer acting chief, but he remained designated as a divisional deputy/senior attorney[7] - step 4, and he received a $3,500 raise.  *Plt.'s Facts* 58; *Dep. Exh. D-4.*  According to Trujillo, he wanted to keep Lebofsky and did not want him hurt, so he

---

[5] Winebrake selected a 57 year-old white male to serve as the divisional deputy for the labor and employment unit. *Lebofsky Dep.* 135, *Aug. 16, 2007*; *Winebrake Dep.* 65, *Aug. 22, 2007*; *Dep. Exh.*. D-7.

[6] Ms. Mouzayck had held this position since 1999 and was second in command at the law department reporting directly to the city solicitor.  She was also the person responsible for handling discrimination complaints within the law department.  *Mouzayck Dep.* 30.

[7] A senior attorney has the same rank as divisional deputy (Lebofsky's position prior to serving as acting chief deputy) for purposes of pay and promotions. *Lebofsky Dep.* 150, *Aug. 16, 2007*; *Dep Exh.* D-8.

3

created a new position, senior attorney serving as a special assistant to the solicitor, that allowed Lebofsky to maintain his salary and "some level of prestige." *Trujillo Dep.* 99.  Trujillo also believed this was a position where Lebofsky could be successful and, though in reality a lateral move, it could be perceived as a promotion. *Id.* at 105–06.  Lebofsky had no objection to the position at that time and did not consider it a demotion. *Lebofsky Dep.* 132, *Aug. 16, 2007.*

On October 5, 2000, Lebofsky was moved from the chief deputy's office to a smaller, less desirable office on the 17th floor. *Plt.'s Facts* 300.  He described this office as being "in the low end rent of the building, so there were a lot of, you know, offices where [sic] junior people and a lot of staff.  There was a copy room relatively close." *Lebofsky Dep.* 95, *Aug. 16, 2007.* Trujillo's and Thompson's offices were also located on the 17th floor.  Lebofsky does not contend that this office was smaller than the office he was assigned as a divisional deputy prior to becoming an acting chief deputy; his comparison is to his office while serving as acting chief. *Plt.'s Facts* 337-38.  It was also at this time that Lebofsky spoke to Thompson about the lack of an assigned secretary[8] and the apparent omission of his name from recent settlement authority memoranda.[9] *Lebofsky Dep.* 177-78, *Aug. 16, 2007.*

His first assignment in this special assistant position was to help Trujillo develop a new, affirmative litigation unit.  This unit was being created to develop cases the law department could pursue on behalf of the City as a plaintiff; for example, filing a lawsuit against gun

---

[8] Lebofsky no longer had an assigned secretary and when he asked Thompson about it he was told to "just see whoever you can find." *Lebofsky Dep.* 190-91, *Aug. 16, 2007.*

[9] Lebofsky does not claim that he was ever told he no longer had settlement authority. *Lebofsky Dep.* 178, *Aug. 16, 2007.* He spoke only to Thompson about this concern. *Id.* At first, Thompson thought it was an error, the second time he was surprised it hadn't been taken care of, and the third time he said he did not know what was going on. *Id.* at 178-79. Lebofsky contends that any assertion that the omission was inadvertent is belied by the fact that it happened three times. *Id.* at 179.

4

manufacturers. According to Lebofsky, Trujillo "made it clear at that point that I would not be in charge of that unit, he wanted someone from the outside who had litigation experience." *Lebofsky Dep.* 130, *Aug. 16, 2007.* Ultimately, Trujillo was unsuccessful in his efforts to recruit experienced counsel from outside the office to head the affirmative litigation unit. *Trujillo Dep.* 109-112; *Lebofsky Dep.* 169, *Aug. 16, 2007.* On November 29, 2000, Lebofsky was informed that the position was filled internally by Shelly Smith (a 35 year-old, African American woman). *Lebofsky Dep.* 160-61, *Aug. 16, 2007.* At the time of her selection as acting chief, Smith had been serving as a divisional deputy city solicitor in the civil rights unit for almost four years and she had been a member of the law department since August 1992. *Dep. Exh.* D-9.

On November 30, 2000, Trujillo announced various management changes and newly-hired attorneys in a memorandum circulated to all law department personnel. *Dep. Exh.* D-7. Included in the announcements were Smith's appointment to acting chief deputy for the affirmative litigation unit and Lebofsky's assignment as special counsel on litigation. Lebofsky viewed this memorandum as a slight because he was not congratulated on his new position as were Smith and two other attorneys who were promoted. *Lebofsky Dep.* 152, *Aug. 16, 2007.* Although he had been working in this position for some period of time prior to this official announcement, Lebofsky did not view his assignment as a demotion until he read the November 30, 2000 memorandum. *Id.* at 158. Lebofsky's position was recorded as a promotion on his personnel records. *Id.* at 153-54; *Dep Exh.* D-4. Almost immediately after the announcement of Smith's promotion, Lebofsky began looking for new employment. *Lebofsky Dep.* 177, *Aug. 16, 2007.*

On February 26, 2001, Mouzayck asked Lebofsky to meet with her to discuss a new

project to which he was being assigned. Lebofsky cut her short and advised that he was leaving the law department for private practice. Mouzayck was surprised to learn Lebofsky was leaving and asked him to reconsider his decision. Mouzayck also learned from Lebofsky that his earlier problems with Winebrake were the reasons for his departure. This led to a meeting later that day of Lebofsky, Trujillo, and Mouzayck. *Dep. Exh.* P-1. They left the meeting agreeing to discuss additional opportunities within the law department for Lebofsky with the hope he would reconsider his intention to resign. *Id.*

Lebofsky met with Trujillo and Mouzayck again on March 1, 2001, and he asked Trujillo to investigate Winebrake's conduct. *Plt.'s Facts* 230. It is at this meeting that, for the first time, Lebofsky articulated his belief that he had been the victim of age discrimination. Now Trujillo and Mouzayck understood that Lebofsky was complaining about age discrimination and about Winebrake's remark about bringing in young attorneys. *Id.* at 231-32, 234; *Trujillo Dep.*, 168-69.

Mouzayck did not conduct a formal investigation of Lebofsky's complaint because he was leaving the office, and because she had previously spoken with Winebrake about Lebofsky's complaints and had decided no further action was warranted. *Plt.'s Facts* 235; *Mouzayck Dep.* 60. However, she did speak with Winebrake on March 7, 2001. This time they discussed Lebofsky's representation that Winebrake had told members of the labor and employment unit not to speak with Lebofsky. *Dep. Exh.* P-25. Winebrake denied Lebofsky's claim. *Id.*

Lebofsky maintains that he would not have left the law department if Trujillo, Mouzayck, and Thompson had acknowledged his complaints and conducted a reasonable investigation of Winebrake by April 5, 2001, Lebosfsky's last day in the office. *Id.* at 248. In contrast, his

resignation memorandum, dated March 5, 2001, does not set forth any conditions upon which he would withdraw his resignation. *Dep. Exh.* D-14. Lebofsky also concedes that he made no claim of racial discrimination during these meetings or at any time during his employment with the law department. In short, however the burden of perceived discrimination may have weighed upon him, Lebofsky did not make his feelings known to the city solicitor, his first deputy, or anyone else until after he had a new job and a substantial salary increase.

## II. PROCEDURAL HISTORY

Howard Lebofsky's five-count, first amended complaint sought relief under the provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Pennsylvania Human Relations Act, as amended 43 P.S. § 951, *et seq.*, the Philadelphia Code, Section 9-1103(A)(1), and the Civil Rights Act of 1866, as amended 42 U.S.C. § 1981.

By memorandum and order dated August 24, 2007, I denied the City of Philadelphia's motion to dismiss but noted that Lebofsky had withdrawn his § 1981 claim and his claims based upon the City's failure to promote him. Following the City's answer and new matter, the parties began extensive discovery which culminated with the City's filing the present motion for summary judgment accompanied by an agreed statement of undisputed facts, Lebofsky's statement of additional disputed facts, and the City's statement of additional disputed facts. In response, Lebofsky withdrew count III, his claim under the Pennsylvania Human Relations Act, but contended that summary judgment should be denied because there were more than 350 material facts in issue. What remains are Lebofsky's claims under the ADEA and Title VII for a

hostile work environment and constructive discharge based on race and age discrimination, and for retaliation based on age.

## III. PRELIMINARY EVIDENTIARY RULINGS

A. The Testimony of the Honorable Karen Simmons

At trial, Lebofsky would offer the testimony of the Honorable Karen Simmons, a former member of the law department. In substance, Judge Simmons would testify in accordance with an affidavit provided to the Equal Employment Opportunity Commission ("EEOC") on September 23, 2004, in which she said,

> During a telephone conversation that I had with Peter Winbraek [sic] in or around January 25, 2001, . . . [Lebofsky's] name came up. Mr. Winbrake [sic] said he was speaking for the Solicitor [Kenneth Trujillo] and then proceeded to tell me that the department wanted to go in a different direction and bring in new younger attorneys.
>
> It was also during this conversation that Mr. Winebrake stated that Mr. Trujillo did not have any respect for [Lebofsky's] opinion and that the reason why Mr. Trujillo lacked respect for [Lebofsky's] opinion was because Mr. Trujillo was trying to move toward a new younger workforce.[10]

*Dep. Exh.* P-8. Lebofsky was not aware of this conversation between Judge Simmons and Winebrake until after he initiated his complaint with the EEOC and thus it had no impact on his decision to leave the law department. However, he offers this testimony to support his claim that the law department was engaged in age discrimination.

Lebofsky contends that Winebrake's statement and the statement attributed to Trujillo are

---

[10] I will disregard this second statement attributed to Mr. Trujillo – that he will not credit Lebofsky because he wants younger people. It is a classic *non-sequitur* and did Lebofsky no harm unless he was aware of it and there is no suggestion that he was.

admissible for three reasons:  they are not hearsay, they are exceptions to the hearsay rule, and they are not excluded by the hearsay rule.  I shall consider each of these contentions in turn but initially only as they pertain to Winebrake; if his statement is not admissible, we never get to that of Trujillo and a consideration of what Trujillo purportedly said is unnecessary.

First, Lebofsky asserts Winebrake's statement is not hearsay because it is not offered for the truth of the matter asserted and, in addition, it is a statement of a party's agent concerning a matter within the scope of his employment and is therefore not hearsay under the provisions of Federal Rule of Evidence 801(d)(2)(D).

I disagree.  Either Winebrake's statement is offered for the truth of the matter asserted, that is to establish what Trujillo purportedly said, or it is completely irrelevant.  Winebrake's statement is not admissible as the statement of an agent of Philadelphia concerning a matter within the scope of his employment.  There was no showing that Winebrake was an authorized spokesman for the City, Trujillo, or the law department, no suggestion that he was involved in planning for its future, and no showing that he had any authority to bring in new lawyers whether young or old.

Lebofsky next contends that Winebrake's statement is admissible because it is indicative of his then state of mind, plan, or intent, an exception to the hearsay rule provided by Federal Rule of Evidence 803(3).  I disagree.  Rule 803(3) does not permit a statement of memory or belief, *Shepard v. United States,* 190 U.S. 96 (1933), an exclusion made necessary to prevent the virtual destruction of the hearsay rule.  To permit Winebrake to recount the statement attributed to Trujillo would require his present belief based upon his memory.

Lebofsky finally contends Winebrake's statement is not excluded by the hearsay rule

9

because of its trustworthiness under the provisions of Federal Rule of Evidence 807. Lebofsky submits that Judge Simmons is a trustworthy source because she originally made the statement under oath while a member of the law department, she had no interest in the outcome of the case, and because she is a judge and thus more credible than non-judges.

Now we come to a consideration of what Trujillo purportedly said.

Rule 807 requires that Judge Simmons' statement be offered as proof of a material fact. The fundamental problem with the admissibility of Judge Simmons' statement under Rule 807 is that it does not tend to prove any fact, material or otherwise. It is simply not relevant.

For present purposes I can only assume that what Judge Simmons said is true and that what she attributes to Winebrake was also a true statement. However, I cannot go beyond what Winebrake said about Trujillo or assume that having said one thing, either or both men meant something entirely different. In other words, I must assume that as of January 25, 2001, City Solicitor Trujillo, who at that point had been on the job for about a year, had decided that sometime in the unstated future he wanted to bring younger attorneys into the law department. There is nothing in general about promoting younger people, demoting older people, or any racial preference that could possibly be inferred from Trujillo's statement. Nor is there anything to connect Trujillo's asserted desire for the future to Winebrake's selection as chief of the newly-created, combined labor and employment unit a half-year earlier, or to Shelly Smith's promotion of two-months earlier. Moreover, younger than whom? Himself? Winebrake? When in the future he wanted to do so, how many younger attorneys he wanted to bring in and for what positions we do not know.

What we do know, however, is that almost two months before January 25, 2001, Mr.

10

Lebofsky had decided to leave the law department[11] and had begun searching for a new job on December 4, 2000. In fact, as of January 25, 2001, Mr. Lebofsky had been busy sending out his resume in response to no less than 29 help-wanted announcements.

Finally, if a search through the haystack produces a needle of relevancy, the probative value is far outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. FED. R. EVID. 403. For all these reasons, the statement attributed by Judge Simmons to Winebrake is not admissible.

B. The Belief of Kenneth Trujillo as Evidence of Racial Discrimination

Lebofsky claims his being passed over for a promotion to chief of the affirmative litigation unit in favor of Shelly Smith is evidence of racial discrimination. Thus, he must establish that the city solicitor's decision to promote Smith over Lebofsky was racially motivated. To establish his motivation, Lebofsky relies in part on Trujillo's deposition testimony.

In response to a question during his deposition conducted years after the fact, Trujillo said he believed that race played a factor in the mayor's decision to appoint him.[12] Lebofsky contends that such a belief would make "it more likely that race impacted decisions Trujillo made when it came to those over whom he had power."[13] *Plt.'s Resp. to March 9, 2009 Order*, 16. However, not only is there no evidence that Mayor John Street, an African American, played any role in the

---

[11] At his deposition, Mr. Lebofsky said that immediately after November 30, 2000, "I just know [sic] I had to get out and that's what I tried to do." *Lebofsky Dep.* 175, *Aug. 16, 2007.*

[12] He went on to explain that based on his experience, those who make appointments "typically will look at a whole host of factors, including race, including gender, including experience, including background, including perceived constituencies and a whole host of factors." *Trujillo Dep.* 123.

[13] This is the type of broad assertion that cannot withstand summary judgment in the absence of any other evidence of discrimination. *See Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992) (mere conclusory allegations in pleading insufficient to defeat summary judgment).

11

hiring or assigning of positions in the law department, but there were specific denials that he did.[14]  Former Mayor Street testified that below the cabinet level, he played no part in city hiring practices and specifically, never discussed with Trujillo the racial makeup of the law department. *Street Dep.* 26-28.  Trujillo testified that the mayor never said that he wanted more minorities in the law department. *Trujillo Dep.* 123.

With the exception of his belief, never made known to his superiors, that he was more qualified to be the chief of the affirmative litigation unit than was Shelly Smith, there is no evidence that race played any part in Lebofsky's decision to retire or that he even knew of Trujillo's belief.  In short, Trujillo's belief had nothing to do with anything and Lebofsky's failure to make any complaint of racial discrimination while employed at the law department confirms that his present belief, whatever it may be, does not make Trujillo's belief, whatever it was, relevant.

Again, of course, there is Federal Rule of Evidence 403.  The significance of Trujillo's belief, at best a shadow of substance on a sea of speculation, is far outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

For reasons that will be discussed, the promotion of Smith over Lebosky occurred outside the relevant time period and cannot be the basis of a separate cause of action.[15]  As will also be discussed, even if the promotion is considered, it fails to establish racial discrimination.  Thus, summary judgment shall be granted on Lebofsky's claims of hostile work environment and

---

[14] The defendant's motion *in limine* to exclude from trial both the testimony of Mayor Street and the introduction of news articles quoting him was granted by separate order dated March 12, 2009.

[15] A fact that was accepted by Lebofsky when he withdrew his discrete discrimination claims based on these two failure-to-promote incidents.

constructive discharge based on race for lack of evidence. The same claims based on age discrimination are discussed separately.

## IV. DISCUSSION

### A. Summary Judgment

The standard for summary judgment is well established. I must consider the evidence in a light most favorable to the non-moving party and, if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion. Here, Lebofsky must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Lebofsky "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1992). He cannot "merely rely upon conclusory allegations in his pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

### B. Statute of Limitations

To pursue an employment discrimination claim under Title VII or the ADEA, an employee must first file a complaint with the EEOC within 180 days of the violation, or within

300 days if prior proceedings with a state or local agency had been initiated.  42 U.S.C. § 2000e-5(e)(1).  This requirement is strictly construed and the failure to pursue the appropriate administrative remedies will bar judicial action.  Lebofsky filed his first charge of discrimination with the EEOC on September 28, 2001.  Therefore, to meet the statue of limitations demands and survive summary judgment, Lebofsky must show that at least one adverse employment action occurred within the 300-day period, that is, after December 3, 2000.[16]

In both his complaint and response to the motion for summary judgment, Lebofsky maintains that at some unspecified point in January 2001, he was demoted.[17]  He makes this claim despite the fact that there was no discreet change in his employment position – no change in title, assignment, or pay, and no other discriminatory act or comment that occurred after November 30, 2000.  Lebofsky's claim that he was demoted some time in January 2001 is significant and is also contradicted by the uncontested facts of this case.

A cause of action accrues, and the statute of limitations begins to run, on an employment discrimination claim when the plaintiff knows or has reason to know of the occurrence that is the basis for the action, not when the consequences of that act become painful.  *See Burkhart v. Widener Univ., Inc.*, 70 Fed. Appx. 52, 53 (3d Cir. 2003) (citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981)).  It is uncontested that Lebofsky's assignment to his last position as a senior attorney was announced on November 30, 2000, and that he had already been serving in that position

---

[16] The parties agree that the 300-day time limit began to run on December 3, 2000.  Although by my count it began to run on December 2, 2000, I accept the parties' date.  In any event, the difference of one day is unimportant.

[17] Not before December 3, 2000, when his time as acting chief was ended, nor when Mouzayck allegedly told him to find work or he would be fired, nor even when he believed he was demoted when the November 30 memorandum was circulated, and despite the fact that he had started looking a new job in December.  He advances what might be called a *tunc pro nunc* theory.

14

prior to the official announcement (although personnel records show the effective date of his promotion was December 11, 2000). He contends that it took the passage of a month or so after the official announcement of his position for him to decide that he had in fact been demoted. In other words, his demotion did not occur when he assumed the duties of his new job, but only after unremarkable hours became uneventful days that became insignificant weeks until, nothing untoward having occurred, somehow or other realization set in.[18]

Lebofsky's assertion is directly contradicted by Lebofsky's deposition testimony that he believed he had been demoted as early as the November 30, 2000 announcement. *Lebofsky Dep.* 153-54, *Aug. 16, 2007*. It is also inconsistent with the uncontested fact that he had begun an earnest search for new employment at that time as well. *Id.* at 175, 177; *Dep. Exh.* D-15.

While it might be established at trial that the duties of this newly-created position were being developed over a period of time and that he had little work to do, even then, on this record no finder of fact could reasonably conclude that Lebofsky was unaware of his circumstances until some time or other in January 2001. By his own testimony, Lebofsky was acutely aware of his circumstances on November 30, 2000, and his dissatisfaction had caused him to act to secure new employment. Thus, to survive summary judgment Lebofsky must provide evidence that he was subjected to some kind of race or age-sparked discriminatory action on or after December 3, 2000, because his demotion, as he now calls it, came plainly before that date.

---

[18] In effect, day does not begin when the sun comes up but only when you look out the window and notice it is there. In other words, he is equating the decision that changed his employment status with his later perception of its effects. The EEOC's 300-day filing requirement makes the difference between November and some time in January important.

## C. Hostile Work Environment

The hostile workplace theory permits a plaintiff's claim to be based on the cumulative effect of the defendant's actions, rather than on any one act of the defendant. *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 117-18 (2002)). In response to the prior motion to dismiss, Lebofsky conceded that his separate discrimination claims based on the law department's failures to promote him to either of the two chief deputy positions in 2000 were untimely, and those claims were withdrawn. Nevertheless, these failure-to-promote incidents could still be considered as part of Lebofsky's hostile work environment, constructive discharge, and retaliation claims if he provides evidence they were part of the same employment practice *and at least one unlawful act occurred within the limitations period. Nat'l Rail. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

To establish a *prima facie* case that he was subjected to a hostile work environment, Lebofsky must present evidence that 1) he suffered intentional discrimination because of age, race, or both; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected him; 4) the discrimination would detrimentally affect a reasonable person in the same position; and 5) the existence of *respondeat superior*. *Jensen v. Potter*, 435 F.3d 444, 449 n. 3 (3d Cir. 2006), *overruled in part on other grounds by Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). In evaluating this claim, I must examine the totality of the circumstances to determine whether Lebofsky's work environment was sufficiently hostile or abusive. Such circumstances would include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with his work performance. *Faragher v. Boca Raton*, 524

16

U.S. 775, 787 (1998). Of course, he must also establish that his claim is timely.

1) Lebofsky's Specific Claims of Discrimination

First, with the EEOC 300-day period in mind, I consider the various employment actions that Lebofsky claims were discriminatory. In the absence of a failure-to-promote or a demotion claim within the relevant period, Lebofsky must show there is evidence that any slights he suffered after November 30, 2000, were discriminatory acts based on his age, and either alone or in combination with his prior burdens, were severe or pervasive enough to make his work environment so hostile that he was forced to resign.

In Lebofsky's affidavit filed in support of his response to the motion for summary judgment, Lebofsky states the following factors combined to cause a hostile work environment that led to his constructive discharge:[19]

9. The discriminatory and retaliatory actions that were taken against me were not taken against younger workers and those who had not complained of discrimination. These actions included, but were not limited to:

[A.]   not being awarded the position of Chief Deputy of the Labor & Employment unit (a position given to a substantially less qualified thirty-four (34) year old);

[B.]   being told by my supervisor that he wanted to bring in "new young attorneys" to the Law Department;

[C.]   being instructed to call my clients and tell them I am not practicing employment law anymore;

[D.]   being completely removed from the Labor & Employment unit;

[E.]   working in an atmosphere where the top city official believes race should be considered in making hiring decisions;

---

[19] I have inserted letters to designate each assertion for ease of reference in the discussion that follows.

17

[F.]   working in an atmosphere where the head of the Law Department believes his race played a role in the decision to appoint him to City Solicitor;

[G.]   working in an atmosphere were [sic] the head of the Law Department wants to go in a "different direction" and "bring in new younger lawyers;"

[H.]   working in an atmosphere were [sic] the head of the Law Department has no respect for my opinion because he wants to move toward a "new younger workforce;"

[I.]   being denied the position of Chief Deputy of the Affirmative Litigation Unit (a position given to a substantially less qualified thirty-five (35) years [sic] old, African American attorney);

[J.]   having my management responsibilities taken away;

[K.]   having my settlement authority eliminated;

[L.]   having my coworkers told not to speak with me;

[M.]   being demoted to a defunct Senior Attorney position;

[N.]   being relegated to an undefined role with no real place in the organizational structure;

[O.]   being given little or no work to do;

[P.]   being told either find work or be fired;

[Q.]   (of the work I was given) being assigned to insignificant and undesirable cases;

[R.]   having Mr. Winebrake react to Ms. Mouzayck's questioning of him concerning my complaints by responding that I was "a problem" and made it clear there was "friction there;"

[S.]   having Mr. Winebrake "cut off" his contact with me;

[T.]   being shunned by Mr. Trujillo and Mr. Winebrake;

[U.]   being denied a response from Defendant to my complaints of discrimination; and

[V.]   being told by Mr. Trujillo in a hostile and angry manner that my complaints

18

of discrimination were never going to be investigated.

10. As of March 5, 2001 the confidence I had in the Law Department, whose purpose was to uphold the laws which protect the citizens of Philadelphia, was crushed. The discrimination and retaliation to which I was subjected to by Defendant caused harm to my professional reputation and a significant blow to my confidence.

*Pls. Opp. to Summ. Judg.,* Exh. A. ¶¶ 9, 10.

. Before I begin a detailed analysis of this affidavit,[20] I note the following:

First, the introductory paragraph lists various acts that were not taken against younger workers or those who had not complained of discrimination. Race is not mentioned.

Second, the affidavit provides no dates – and dates are critical to establish compliance with EEOC filing requirements for the reasons I have set forth.

Third, for these events to matter, alone or in combination, they must be pervasive or severe and result from some decision that was based on age or an intention to retaliate. It is not enough to show unpleasant consequences in the workplace. They must flow from an act of discrimination.[21]

Fourth, immediately after November 30, 2000, Lebofsky determined that the conditions of his employment were intolerable and he could no longer bear them. Therefore, if any of these events fell within the 300 days required by the EEOC, they are mere postscripts to the conclusion Lebofsky had already reached.

---

[20] Most of these factors echo matters found in Lebofsky's depositions. I shall rely on what he said there in further explanation of his affidavit.

[21] So long as what the law identifies as discrimination is not in involved, there is no requirement that a supervisor be friendly, courteous, or kind. To the contrary, the boss may be demanding, exacting, and unreasonable. He or she may deride, discipline, or demote with or without cause. Again, so long as what is inflicted is not a pretext for discrimination, there is no guarantee that the workplace will be cheerful and pleasant, smiles and compliments, praise and promotion. Bad management techniques are not in and of themselves discrimination.

Fifth, although he may have complained to Thompson about some of these perceived deprivations, Lebofsky never couched his woes in terms of discriminatory acts taken against him and he never made a formal complaint to anyone about any of them.[22]

Finally, however egregious his circumstances may have been, Lebofsky was willing to forget them all and stay with the City if after his final meeting with Trujillo and Mouzayck "they had advised me that they had changed their minds," *Lebofsky Dep.* 33, *Aug. 20, 2007*, and were willing to give him the title of chief[23] and conduct an investigation of Winebrake, *id.* at 28-30.[24]

   2) None of Lebofsky's Claims of Discrimination Occurred Within the
      EEOC 300-day Time Period.

As previously stated, Lebofsky must show evidence of at least one adverse employment action that occurred after December 3, 2000, before I can consider whether from his other claims a jury could find a pattern of hostility that resulted in his constructive discharge. With this search in mind, I review each of the assertions in his affidavit.

---

[22] To an experienced employment lawyer, the difference between complaining and making a complaint is as vast as the difference between a gob and a goblet, for while a gob is a sailor, a goblet is not a little sailor.

[23] A title "was very important" to Lebofsky. *Lebofsky Dep.* 17, *Aug. 20, 2007*. He wanted his title to be chief, *id.* at 25, but Trujillo considered the title inappropriate. As Trujillo explained, "[Lebofsky] would have been chief of nothing. Chief implies that . . . people are reporting to you. If he's not supervising other lawyers, there's nothing to be chief of." *Trujillo Dep.* 107.

[24] Although the matter of title and an investigation of Winebrake were the only conditions to which Lebofsky referred in his deposition, there may or may not have been other matters discussed. Mouzayck reported the March 1, 2001, meeting in this way: Lebofsky said, "[T]hese kinds of responsibilities that we talked about [had] already started coming his way. He knew it would be higher profile, he knew it would be interesting work, he knew he was going to work with Bill, that was working out for him, it was a good fit." Then Lebofsky asked, "Well, what are we going to do about Peter? What Peter did was illegal and you should – you can settle with me, discipline him." And Ken heard the word settlement and he said, "I'm beginning to feel set up here, I feel like this is just about you wanting to make a lawsuit. If you want to stay here, you have to get [over] this thing over Peter . . . he wasn't going to consider any settlement." And the conversation ended. Howard was going to think about it. *Mouzayck Dep.* 44-45. Trujillo recalled, "I felt that he was trying to set us up for a lawsuit." *Trujillo Dep.* 169.

First, my preliminary rulings[25] in this case reduce Lefosky's complaints for evidentiary reasons. His complaints concerning the "atmosphere" in which he worked (E through H) are based on evidence that I have ruled inadmissible. There is also no evidence that the facts alleged to support these atmospheric claims were known to him[26] at the time of his employment or how any or all of them could have, or did, adversely affect his working conditions or compel him to resign. I will also put aside any acts related to his alleged November 30, 2000 demotion (J and M), his two failure to be promoted claims (A and I), and anything that took place while he was a member of the labor and employment unit (B, C, D, and L) because they all occurred prior to December 3, 2000, as did (R) and (S).[27]

Lebofsky's complaint that he was "shunned" by Winebrake and Trujillo (T) is too indefinite to have any meaning – there is no mention of frequency, how, when, where, or to what effect.[28]

In his affidavit, Lebofsky asserts two complaints that relate to the quality and quantity of

---

[25]   I am referring to my ruling inadmissible the statement supposedly made by Trujillo that he wanted to bring younger lawyers into the department and his belief that race may have been a factor in his being chosen to be city solicitor.

[26]   Since Lebofsky says younger workers were not subjected to the "discriminatory and retaliatory actions taken against" him, the atmosphere was of the selective variety.

[27]   In addition, Lebofsky did not know of Winebrake's reactions until they were disclosed in discovery. Mouzayck discussed Winebrake's reaction to Lebofsky's charges in her deposition. *Mouzayck Dep.* 55-57. As to Winebrake's cutting off his contact with Lebofsky, Winebrake explained, "[W]hen he talked to me, he would always make references to his age. . . . He would often bring up his age. . . . [H]e affirmatively brought up the issue of his age and referred to me as like an up and coming young guy. At that point, it became obvious to me that he was someone who was trying to lure me into saying something about age. And I basically cut off my contact with him." *Winebrake Dep.* 111.

[28]   As I previously noted, there is no requirement that an employer ensure the friendly relationships of its employees and there is no evidence that this lack of contact adversely affected Lebofsky's ability to meet his employment responsibilities.

work-assignments (O and Q), a warning to find work or be fired (P), and being relegated to an undefined role in the law department (N).

With regard to his work assignments, Lebofsky lapsed into vagueness. Only one undesirable case that another lawyer did not want came to mind, and he was unable to remember to whom he may have complained about not having enough work to do. *Lebofsky Dep.* 159-60, 187, *Aug. 16, 2007.* Uncertainty, no matter how certain, is not enough to resist summary judgment.

He attributes the comment about finding work to Mouzayck when she walked in on a conversation he was having with Stephen Atkins[29] and Thompson. "That's when she, you know, basically said you'll find work to do or you'll be fired . . . . [She said it] to Steve and I [sic], I think." *Id.* at 197. From all that is apparent, this conversation took place before December 3, 2001, and at worst, was an isolated threat and no more an employment action than an acorn is a tree. In any event, no one took any steps to fire Lebofsky, nor did his alleged lack of work result in any disciplinary action or derogatory employee evaluation. In fact, Mouzayck made efforts to convince Lebofsky to stay with the law department once he made his intention to resign known. *Lebofsky Dep.* 24-25, *Aug. 20, 2007; Dep. Exh.* P-1.

Lebofsky's complaint about being relegated to an undefined role in the department also took place prior to December 3, 2000.[30] Lebofsky agreed that Trujillo's memo of November 30, 2000, announced Lebofsky would be functioning as special counsel on litigation matters, but

---

[29] Stephen Atkins, then age 52, was chief of the labor unit until the creation of the labor and employment unit. He then was appointed senior attorney serving as special counsel on ADA and FMLA matters. *Dep. Exh.* D-7.

[30] While his slot on the organization chart may not have been designated, periodically he was getting assignments so he would basically report directly to the city solicitor. *Lebofsky Dep.* 131, *Aug. 16, 2007.*

commented the work was basically the same as he had been doing in the past. *Id.* at 143, 149.

Moreover, Lebofsky's general sense that his role in the office had been diminished in reality and

in the eyes of his co-workers, or even his fear that he was vulnerable to a future lay-off, is not

unusual when there is a change in upper management, and is too speculative to suggest a hostile

work environment. *See Vogel v. Honeywell*, No. 88-4612, 1989 U.S. Dist. LEXIS 4958 (E.D. Pa.

1989) (the plaintiff's subjective view that a new position offered would ultimately be eliminated

or downsized was mere speculation and not actionable).

      Lebofsky also contends not having settlement authority (K), and being denied a response

to his complaints of discrimination (U) are adverse employment acts.  As with each of the

preceding acts, both of these events occurred prior to November 30, 2000.

      Taking these matters in turn: although Lebofsky feels it was a "huge" thing not to be

mentioned on the periodic memoranda that stated settlement authority, he never intimated that it

made his job impossible, or even more difficult.[31]  Although he told Thompson of his concern, he

never asked Thompson to do anything about it.  The non-response to Lebofsky's "complaints of

discrimination" are present make-weights.  Again, he only mentioned these things to Thompson

and although he may have hoped or even expected Thompson would take some action, he does

not claim that he asked Thompson to do so and he never described his grievances as acts of

discrimination against him at the time he made them to Thompson.  I conclude no jury would

attribute more importance to the settlement authority question or Lebofsky's complaints now than

Lebofsky did then.  Moreover, as late as February 26, 2001, he had no complaints about

---

[31] He did say that not getting the job that went to Shelly Smith, being allowed to "stew" in a small office with basically less desirable assignments, and being "disempowered" made it hard for him to do his job. *Lebofsky Dep.* 16, *Aug. 20, 2007.*

Thompson[32] or Mouzayck. *Lebofsky Dep.* 14, *Aug. 20, 2007.*

Thus, with the exception of Trujillo's refusal to conduct a further investigation (V), each of the acts set forth in Lebofsky's affidavit occurred prior to December 3, 2000, and prior to his decision to leave the office.

From any perspective, what was to be served by a Trujillo investigation? Mouzayck had already investigated. Lebofsky said he was leaving and had already accepted a lucrative offer at a law firm. Lebofsky agreed that Winebrake's statement, without action, was not an act of discrimination.[33] Although Lebofsky now says if Trujillo and Mouzayck had changed their minds, had given him the title of chief and investigated Winebrake, he would have stayed with the City, he did not tell them that in his letter of resignation. *Lebofsky Dep.* 33, *Aug. 20, 2007; Dep. Exh.* D-14. The failure to do a futile thing will not give rise to a viable legal claim.

In addition to the factors set forth in the affidavit on which he relied to contest summary judgment, Lebofsky has recounted other annoyances suffered as a law department employee. He stated he started looking for another job immediately after Shelly Smith was named to head the new affirmative litigation unit on November 30, 2000, because he had been kept out of meetings, his office space had been changed, he had no assigned secretarial support, and he also had to scavenge for furniture when he moved to his new office.[34] *Lebofsky Dep.* 177-84, *Aug. 16, 2007.*

---

[32] He also said, " I have to tell you as I sit here I have a hard time saying that Bill [Thompson], you know, set out to discriminate against me, I really truly do. And I think given who he is, Bill, would not have hurt me one little bit, I really believe that." *Lebofsky Dep.* 189, *Aug. 16, 2007.*

[33] Although at his deposition, Lebofsky testified that "[t]he illegality would be if he executed it, not saying it." *Lebofsky Dep.* 106, *Aug. 16, 2007.* And "the words he said were not illegal. To do what he was reflecting in those words, in my opinion would have been illegal." *Id.* at 146.

[34] The other side of that coin is that he got to pick and choose what he wanted for his office just as I did when I explored a storage nook in this very court house and found three chairs and two lamps for my chambers.

24

Since these perceived offenses were all motivating factors in Lebofsky's job search, each obviously took place before December 3, 2000.

I conclude that Lebofsky has not shown any evidence of age discrimination within the EEOC 300-day requirement, and on that basis alone, the City is entitled to summary judgment. However, even if Lebofsky had timely filed, his claims would not survive summary judgment for the reasons that follow.

### 3) Smith's Promotion is Neither Evidence of Age Nor Racial Discrimination

As I previously pointed out, Shelly Smith's promotion and that of Winebrake were withdrawn as separate causes of action but both could still be considered as evidence of a hostile work environment[35] had Lebofsky been able to cite an adverse action within the EOOC's 300-day requirement.

With the burden-shifting analysis of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) in mind[36] for claims under Title VII and the ADEA, I conclude that Lebofsky is able to

---

[35] Lebofsky's demotion claim is really a part of his failure to promote claims because his change in status was caused by the fact that he did not get permanently assigned to a chief deputy position – and of course, that happened well outside the limitations period.

[36] The plaintiff must first establish a *prima facie* case. To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must establish that (1) he was a member of the protected class (over 40 at the time he applied for the position in question); (2) he was qualified for the position in question; (3) despite his qualifications, he was rejected; and (4) the employer ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination. *Narin v. Lower Merion School Dist.*, 206 F.3d 323, 331 (3d Cir. 2000) (citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir.1995)). To establish a *prima facie* case of racial discrimination under Title VII, the plaintiff must meet the same criteria but with race as the qualifying protected class. *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 (3d Cir. 2006). A plaintiff is only required to produce evidence sufficient to create an inference that an employment decision was based upon an illegal discriminatory criterion. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356-57 (3d Cir.1999).

If the plaintiff is successful in making out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for his action. *McDonnell-Douglas Corp.*, 411 U.S. at 802-803. Finally, "should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

establish a *prima facie* case of discrimination based on both age and race merely by being a member of each protected class, not getting a promotion for which he was qualified (even if it was determined he was not the best qualified), and showing the positions were filled by others outside the protected class. However, the City has articulated legitimate, non-discriminatory reasons for both promotions and Lebofsky has failed to provide evidence of pretext. The ultimate test in employment discrimination cases is whether discriminatory animus was a motivating factor in causing the adverse employment action. *Costa v. Desert Palace*, 539 U.S. 90, 95 (2003). Lebofsky has not offered any evidence from which it could be found that such animus was the motiving factor in either promotion decision.

Smith started in the law department four years before Lebofsky. Nevertheless, he argues that he was better qualified for a supervisory position. As proof, he points to Smith's deposition testimony, two evaluations of her job performance, and one of his own evaluations.

Lebofsky starts with a reference to a portion of Smith's deposition where she recalled that as a result of an unknown complaint from an unknown source at an unknown time about an unknown topic, the city solicitor, Stephanie L. Suber-Smith who served in that capacity from 1996 to 1999, sent Smith and two others to management training. Lebofsky contends that since he was never sent to management training, this diaphanous incident demonstrates his better qualifications and thus that he suffered from intentional discrimination. While I admire the ingenuity of the

---

To avoid summary judgment, a plaintiff's evidence rebutting an employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations, emphasis and footnotes omitted).

argument, I fail to see how training yesterday demonstrates unfitness today[37] – especially when the yesterday may have been as much as four years ago.

Lebofsky next quotes from Ms. Smith's evaluation of June 1999, where in part of a sentence it is said that she "initially experienced some difficulty in successfully applying her skills to her management responsibilities." *Dep. Exh.* P-15, 3. What he fails to quote is the sentence's opening phrase, "While Shelly Smith has always exhibited a high level of natural skill as a trial attorney. . . ." *Id.* He also overlooks the next sentence, "She has worked very hard to bridge this gap and has, in the past year, demonstrated a high degree of proficiency in terms of assignment management and productivity." *Id.*

The evaluation also contains the following assessment of her supervisory skills and strengths:

- [I]n terms of analytical ability and judgment, I believe that Shelly has few peers. She is always quickly able to identify and properly analyze complex issues. She is extremely helpful to those that she supervises as well as to her colleagues in assisting them in developing their analytical skills and in helping them work through complex issues. *Id.* at 1-2.

- Universally, the feedback I have obtained from junior and senior lawyers and support staff has been extremely positive. Everyone in the Unit appreciates Shelly's incredible gifts and intelligence. This reaction is consistent with my own personal observations of her interactions with support staff, in her meetings with attorneys she supervises, and in staff meetings. *Id.* at 3.

- In terms of managerial knowledge and skills, Shelly has made great strides and taken a great deal of initiative over the last year to utilize and implement the training and materials that we have received in our formalized management training. *Id.* at 2.

---

[37] For example, the fact that others have been trained to play the cello and I have not could hardly be taken as proof of my superiority to perform with the Philadelphia Orchestra.

Lebofsky then turns to Smith's evaluation of June 2000 and points to the statement, "On occasion Shelly has butted heads with other attorneys outside the Unit," as an example of inappropriate conduct.[38] *Dep. Exh.* P-17. He also asserts this shows Smith did not have a proven supervisory record and enviable leadership skills. In her deposition, Smith was asked about this "butting heads" incident. *Smith Dep.* 117-120. She explained that during the course of some litigation she needed information from another city department. It was not supplied and that department's lawyer objected to Smith's not seeking the information through her. As a result, she and Smith were told to "play nice" and the other city department was to be advised that it needed to cooperate in the future. *Id.* 119.

Again, Lebofsky ignores the numerous favorable comments in Smith's June 2000 evaluation.

- She is one of the best and brightest young lawyers certainly in the Law Department and most likely in the city. *Dep. Exh.* P-17, 2.

- Her clients have always spoken positively of her analytical abilities and judgment, and they frequently contact her to discuss random legal issues that confront them. *Id.*

- In terms of accepting responsibility, Shelly is quite willing to accept responsibility when appropriate under the circumstances, but she has little tolerance for pettiness or office politics. When an issue arises, her preference is to deal with it directly and to move on. In this regard, she exhibits a great deal of logic and common sense that is often lost on others. *Id.* at 3.

Unquestionably, Lebofsky's latest evaluation is also favorable though perhaps not in positive terms as enthusiastic or as comprehensive as Smith's. In any event, it cannot be said that

---

[38] "Inappropriate" is Lebofsky's word suggesting that it is wrong for a lawyer to disagree with another lawyer. I hope this is not what he meant and further, I trust the time will never come in America when lawyers cannot disagree with each other or disagree with a judge.

from a comparison, a jury could find that his experience, legal skills, and management ability were superior to those she possessed. *Dep. Exh.* P-22.

While the cake needs no icing, Lebofsky never said he complained to his superiors about Smith's elevation – not even after he had decided to leave the law department. Lebofsky never said her elevation was evidence of racial (or age) bias, never said racial bias made his job intolerable, and never said racial bias was a factor in his decision to leave City employment. Nor has he come forward with evidence sufficient to support such a claim.

In summary, no jury could reasonably find that Trujillo's selection of Smith to head the new affirmative action unit is evidence that Lebofsky suffered from an act of racial or age discrimination or that it provided evidence of a hostile work environment.

4) Winebrake's Promotion is not Evidence of Age Discrimintion

Lebofsky also points to the earlier promotion of Peter Winebrake instead of himself as age discrimination and thus a factor in creating a hostile work environment in the law department. Lebofsky admitted he never heard any one in the department, any supervisor, or the city solicitor make any discriminatory statements about age with the exception of the comment he attributes to Winebrake about bringing in new, young attorneys. *Lebofsky Dep.* 61-63, *Aug. 16, 2007.* Lebofsky relies solely on the fact that Winebrake was younger (34 years-old) and, in Lebofsky's view, less qualified to head the newly formed labor and employment unit. However, it was not until after Winebrake was appointed chief and made his offhand comment that Lebofsky began to develop an age-related belief about Trujillo's conduct of the law department.

In response to Lebofsky's claim, the City has articulated legitimate, nondiscriminatory reasons for promoting Winebrake over Lebofsky based on their respective experience,

29

qualifications and temperament. Lebofsky's offer of evidence to establish pretext is lacking. *See Ezold v. Wolf Block*, 983 F.2d 509, 527 (3d Cir. 1992) (without some evidence to cast doubt on the employer's stated reason, the court will not interfere in an otherwise valid management decision).

In arguing for his superior qualifications, Lebofsky cites his experience as a private attorney for eleven years when he handled employment cases and his four years with the City defending discrimination and retaliation cases. He says that Winebrake "had not been working on employment or labor law cases" and refers to Winebrake's experience as "mostly handling police brutality cases."

Somehow or other, Lebofsky overlooks Winebrake's experience in handling § 1983 cases involving First Amendment rights, due process rights, and Eighth Amendment rights. *Winebrake Dep.* 44. Winebrake had also tried four or five cases in federal court. *Id.* at 45-47. Lebofsky also fails to mention that after graduating from law school, Winebrake spent a year as a law clerk for a justice on the Supreme Court of New Hampshire, and then spent approximately five years in the New York City law department where he eventually held a supervisory position. He handled more federal employment discrimination cases than any other type, but also had § 1983, Title VII, Americans with Disabilities Act, and Individuals with Disabilities in Education Act cases. *Id.* at 13-20, 22. All of the federal employment discrimination cases went to his unit. *Id.* at 35. He also handled many labor cases in state court. In federal court his experience included five trials and the settlement of twenty-five others. *Id.* at 25-28. After he left the New York City law department, he spent approximately two years in the litigation department of Ballard Spahr, a large Philadelphia law firm. *Id.* at 29-31. With this background and experience, he came to the

30

City's law department.

Lebofsky tries to bolster his argument that age was involved in the choice of Winebrake to head the newly-created unit by saying that Trujillo, who made the selection, "didn't even care about [Winebrake's] experience with the subject matter for which [Winebrake] would be in charge." *Ptf.'s Mem. Opp. Summ. Judg.* 11. Lebofsky supports this statement with a portion of Winebrake's deposition where he says that prior to being offered the job, he and Trujillo had never discussed it. *Id.*

Again Lebofsky engages in selective short-cite-edness for Winebrake also explained that a month or two before he talked to Trujillo about the job he heard that Trujillo "was asking people about me." *Winebrake Dep.* 50-52. He also ignores other dealings these two men had with each other while working together in the law department. Previously Winebrake had briefed Trujillo a number of times on different kinds of cases in the civil rights unit. On occasion he did so to get settlement authority in high profile cases. On these occasions he discussed the strengths and weaknesses of the cases and why he thought they should be settled. *Id.* at 53-54.

Trujillo himself provided much more information about his reasons for selecting Winebrake to head the new labor and employment unit.[39] He had discussed the matter with Mouzayck. It was not one conversation but over the course of weeks and weeks, perhaps months. It took longer than he would have liked. *Trujillo Dep.* 54-56.

He reviewed Winebrake's writing product. *Id.* at 78. He chose Winebrake because of his "extraordinary work ethic," "his organizational skills in getting cases resolved," he had "good

---

[39] I am well aware that Lebofsky is still a practicing attorney and I see no reason to repeat all of Trujillo's explanations. However, if this matter is appealed and at that point the choice of Winebrake over Lebofsky is an issue, I will consider issuing a supplemental opinion on this point.

experience in the labor and employment world," "his background in a large law firm would be helpful," and "he came highly recommended." *Id.* at 79. Winebrake's age played no role in the decision. *Id.* at 81. At a supervisory level, experience is important. The longer someone has been practicing law, the better judgment that person will have. Therefore, in Winebrake's scenario, his relative youth was a downside. *Id.* at 85-86.

In summary, the record in this case presents many reasons why Trujillo chose Winebrake over Lebofsky to head the labor and employment unit. There is nothing from which it could be concluded that age was a factor and while he was still employed by the City, Lebofsky never suggested to anyone that it was. Perhaps if Lebofsky had come forward with his concerns that Winebrake was not as qualified as he while still a member of the law department, he would have been better informed as to Winebrake's qualifications and would not have harbored such resentment at Winebrake's appointment. In any event, Winebrake's promotion is not evidence of either age discrimination or a hostile work environment.

5) <u>Winebrake's Comment was Neither Evidence of Age Discrimination nor an Act of Discrimination</u>

Lebofsky asserts that Winebrake's comment that he wanted to "bring on board new, young attorneys" is direct evidence of age discrimination.[40] In the context of this case, this statement is not evidence of anything. There is nothing in and of itself that is discriminatory about bringing in young attorneys. It is done by law firms throughout the City when first-year associates are hired. It is done in this courthouse every fall when new, law clerks are hired. It is done by the Supreme Court. It is done by the Court of Appeals. It is a simple reality that most,

---

[40] *See* n. 34.

but not all, law clerk applicants are recent graduates of law school.  It is also a reality that most recent graduates, but not all, are young.  These realities do not support an inference of age discrimination.

Second, there is no evidence that Winebrake did or could determine policy matters in the law department.  Third, Lebofsky has offered no evidence that Winebrake acted on these words in any fashion, discriminatory or otherwise.  Fourth, Winebrake's comment hovers between the meaningless and numerous, non-discriminatory interpretations.  As insight and understanding are impossible in the absence of explanation or action, only by speculation can we have even an amorphous idea of what Winebrake meant at the moment, if he had anything definite in mind at all, and of course, it was said well before December 3, 2000.  In addition, even if this statement was direct evidence of an intent to discriminate, there is no evidence to suggest that any employment action – any critique, comment, conclusion, doubt, decision, direction, policy, procedure, or practice – by Thompson, Mouzayck, or Trujilllo was based on anyone's age. Surely if age was a factor in the law department, someone else would have paid the price of maturity, but Lebofsky fails to suggest that age was used to cut anyone's halyards save his own.[41]

Then there are the things not part of the record here that might bolster Lebofsky's age discrimination claim.  Lebofsky has not alleged that anyone in the law department ever made a discriminatory comment about *his* age – he was never the butt of a joke based on his age, was never called an old man, was never told he was too old to handle his job responsibilities – the

---

[41] As of April 5, 2001, there were ten members of the law department who were 50 years of age or older, and thirty-seven who were 40 or older.  *Dep. Exh.* P-10.  In fact, after Lebofsky's transfer from the labor and employment unit, Winebrake selected Stephen Miller (age 57) to be the divisional deputy.  *Lebofsky Dep.* 135, *Aug. 16, 2000.*  Two other older attorneys, Mary Schmidt (age 52) and Ann Barton (age 50) remained in the unit.  *Id.* at 137-39.

type of conduct that often is present, although not required, in cases of this kind.  In contrast, Lebofsky testified that he never heard any supervisor or the city solicitor make any discriminatory statements about age in general with the exception of the one comment he attributes to Winebrake.  *Lebofsky Dep.* 61-63, *Aug. 16, 2007.*

In short, there is no evidence that age was a motivating factor, discriminatory or otherwise, for any employment decisions during Trujillo's conduct of the law department.

Finally, so there will be no mistake about it: what Winebrake purportedly said to Lebofsky about wanting to staff the labor and employment unit with new, young attorneys was not an adverse employment action to Lebofsky individually.  It was not pointed at him or anyone else.  It was not an insult.  It was not an act of ridicule.  It was not a threat.  It was not an act of intimidation.  It was not a plan.  There was no follow-up.  At the time, Lebofsky said he was concerned for Winebrake's sake – not his own.  *Lebofsky Dep.* 146-47, *Aug. 16, 2007.*  And, of course, there was nothing illegal about what Winebrake said anyway.[42]

6) Lebofsky's False Premise

Lebofsky builds his whole case on Winebrake's comment and the assumption, despite his own denials, that as to him it was an act of discrimination and that all of the subsequent, distressing events he suffered were based on age discrimination or were punishment for his telling Thompson about Winebrake.  Assuming for the sake of inquiry that all of Lebofsky's perceived misfortunes flowed from Winebrake's comments, and assuming all the other requirements for a hostile work environment existed, Lebofsky's claim still fails because Winebrake's comment was not an act of age discrimination or evidence of discrimination.

---

[42] *See* n. 34.

34

Untoward events, however grievous and perturbing, that do not flow from an act of discrimination, cannot meet the demands of Title VII or the ADEA.

No matter how often you invert and shake an empty bottle, nothing will flow from it.

7) <u>Lebofsky Has Not Shown a Pattern of Conduct that was Pervasive or Severe</u>

Even if Lebofsky had been able to point to an act of discrimination that arguably took place within the 300-day period, he would also have to show there was a evidence from which a jury could find a continuing pattern of discrimination that was pervasive or severe. Pervasive means more than numerous. It means continuing, domineering, concerted, not merely episodic. Severe means extreme, grievous, abusive, threatening, not merely annoying or hurtful.

When Lebofsky was assigned to be the acting chief of special litigation he received an incremental raise within the divisional deputy/senior attorney pay scale, but he was not elevated to the chief deputy pay scale. He was moved to the chief deputy's office, had an assigned secretary, a chief's settlement authority and management responsibilities. This all changed when the unit was merged into the new labor and employment unit and he was not selected for chief of that unit. He was moved from the corner office to an office comparable to the office he was assigned prior to serving as an acting chief deputy. He no longer had the same settlement authority, secretarial assistance, or management responsibilities that go with that position (but he was assigned a special counsel position and given another raise).

An off-hand comment, a casual threat, distasteful instructions, an undefined spot on the organizational table may be carefully-nurtured drops, but they are no torrent. The then-unknown, lately-learned, are unlit candles, not a beacon. Lebofsky's being kept out of meetings of a unit to which he was no longer attached, not having the office, authority, responsibilities, or assigned

secretary for a job he no longer held, and having to select his own furniture do not add up to pervasive or achieve the realm of severe.

Other than a general complaint that he was unable to properly perform his work responsibilities, Lebofsky has not alleged one instance where his work was adversely affected at anytime before or after November 2000. There is no recounting of a phone call missed, a letter not sent, a case not settled, a brief not filed, anything overlooked or delayed. He does not state that he had no desk or phone or computer or how the lack of any unspecified office furnishings adversely impacted his ability to do his work. He does not explain with any specificity why his assigned cases were undesirable or beneath his expertise or explain who should have handled them for the law department. He does not explain why he did not wait to hear what new project Mouzayck was going to assign him before tendering his notice of intent to resign. This is particularly significant in light of his claim that it took him two months to realize he had been demoted and that his realization was based in part on the lack of important work.

I make this analysis mindful that "Title VII is not a general civility code nor a statute making actionable ordinary tribulations of the workplace." *Eason v. Del Monte Foods*, No. 04-1698, 2006 U.S. Dist. LEXIS 65543, *31 (W.D. Pa. 2006) (quoting *Davis v. City of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). In other words, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift SYS., Inc.*, 510 U.S. 17, 21 (1993). While his feelings may have been hurt, or his ego bruised, and he was certainly unhappy that he had been passed over for two promotions, there is no evidence that Lebofsky suffered any intimidation, ridicule, or insult; that his work

36

product was adversely affected; or that his employment with the law department was in jeopardy. Rather, Lebofsky experienced just the sort of circumstances an employee would face when adjusting to a new administration that is developing its own management team.

In *Eason,* the plaintiff's complaints were very similar to those of Lebofsky. Eason claimed she was denied certain promotions, and subjected to a hostile work environment based on race and gender because she was excluded from meetings, deprived of a caller ID telephone, a lumbar chair was removed from her office, her corporate credit card was revoked, and she was required to keep her office door open at lunchtime. *Eason,* 2006 U.S. Dist. LEXIS 65543 at *14. The court held, as a matter of law, that these conditions were not severe or pervasive enough to make out a claim for a hostile work environment. *Id.* at 32. The court found further that there was no evidence the conduct of the employer unreasonably interfered with her work performance. *Id.*

There is nothing to distinguish Lebofsky's claims from Eason's or to cause a different result.

8) No Reasonable Jury Could Conclude that Howard Lebofsky or a Man with His Background was Subjected to a Hostile Work Environment.

According to Lebofsky, the way he was treated "crushed" his confidence in the law department and "caused harm to [his] professional reputation and a significant blow to [his] confidence." *Lebofsky Affidavit* ¶ 10. Unfortunately, such subjective feelings are not enough to establish that he suffered from an adverse employment action. *See Eason,* 2006 U.S. Dist. 65543 at 32 (the plaintiff's subjective feelings of isolation are insufficient to establish hostile work environment); *Gray v. New York Newspapers, Inc.,* 957 F.2d 1070, 1083 (3d Cir. 1992) ("[t]he

37

law does not permit an employees's subjective perceptions to govern a claim of constructive discharge").[43]

After a careful, even painstaking review of the evidence viewed in the light most favorable to Lebofsky, I conclude that no reasonable jury could find that the assertions this particular man makes about the conditions under which he worked, alone or in combination, constituted a hostile work environment. In addition to his experience as an employment lawyer, he was a graduate of the Philadelphia school system and had labored on a loading dock, became a retail salesman, was an executive assistant for security services at a large university, and more important, was a former Philadelphia foot patrolman for three years and detective for ten years. No factfinder could conclude that a man of such experience would be so demoralized by the events related by Lebofsky that he could not function as an attorney for the City law department.

Lebofsky himself summarized his feelings, until November 30, 2000, about the grand total of the matters he now maintains made work at the law department intolerable. When asked when he first realized he was being treated illegally by Trujillo, Lebofsky responded, "I think I really tried to put my faith in the City. I think up until the promotion of Shelly Smith, that's exactly what I did. And I just rationalized away or excused anything they did." *Lebofsky Dep. 70, Aug. 20, 2007.* Surely, a man of Lebofsky's age and job history must have encountered the bumps and bruises of the workplace and everyday living and managed to survive unscathed. Any

---

[43] As in *Eason*, Lebofsky's complaints, alone or in combination, and in the absence of any objective evidence of an adverse impact on Lebofsky's ability to perform his job are insufficient to permit a reasonable finder of fact to conclude that this was a hostile work environment. The time for generalities has passed – Lebofsky cannot rest on his conclusory allegations. *Harter*, 967 F.2d at 852. In responding to the motion for summary judgment, Lebofsky was required to turn face up the cards on which a verdict in his favor could be based and he failed to do so. *Williams*, 891 F.2d at 460.

reasonable jury would conclude he could have done so here. In other words, all this business about a hostile work environment was an afterthought and one that rests upon the shifting sands of things that this man could just rationalize away or excuse.

9) <u>Lebofsky has not Provided Evidence of a Hostile Work Environment</u>

In summary, Lebofsky has not shown an act of age discrimination took place within the EEOC's 300-day requirement.

The promotion of Shelly Smith is not evidence of age or racial discrimination

The promotion of Peter Winebrake is not evidence of age discrimination.

Winebrake's statement to Lebofsky was neither evidence of age discrimination nor an act of discrimination.

Lebofsky has not shown any evidence that age was a factor in any law department decision.

Lebofsky has not shown evidence of employment actions that were pervasive or severe.

Lebofsky has not shown evidence from which a reasonable jury could find that as to him there was a hostile work environment in the law department.

D. <u>Retaliation</u>

To establish a *prima facie* case of retaliation, Lebofsky must show 1) he engaged in a protected activity; 2) after or contemporaneous with engaging in that protected activity, he was subjected to an adverse employment action; 3) the adverse action was "materially adverse," and 4) there was a causal connection between his protected activity and the adverse employment action. *Hare v. Potter*, 220 Fed. Appx. 120, 128 (3d Cir. 2007) (citing *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006)). This claim is limited to age discrimination because

Lebofsky acknowledges he raised no complaint of racial discrimination during his employment.

For all the reasons discussed, Lebofsky has failed to establish that he was subjected to an adverse employment action within the statute of limitations and therefore cannot prevail on his retaliation claim. Lebofsky relies on the same litany of actions discussed above to support his retaliation claim, but these acts occurred well before December 3, 2000.

That aside, no reasonable finder of fact could conclude that an experienced labor and employment attorney believed that his conversations with Thompson about a single, offhand comment made by Winebrake constituted a complaint of discrimination or were protected activities. Even if he believed an investigation was required based on these conversations, he never asked for an investigation until he had his hand on the exit door. Surely someone with his knowledge who expected an investigation would ensue, and then found in the passing days, weeks, and months, that none was being conducted, would have followed up with some kind of inquiry or complaint and employed the anti-discrimination process available in his office. Moreover, even if these conversations caused his reassignment to a position outside the labor and employment unit, this reassignment was one that resulted in a raise and direct reporting to the city solicitor and the chief of litigation and cannot be considered a materially-adverse employment action.[44]

The first discussion that could arguably be described as a protected activity did not occur until Lebofsky gave his notice to Mouzayck on February 26, 2001. By that time he had already accepted a position with a law firm, and no employment action, adverse or otherwise, occurred

---

[44] Further, for the reasons already discussed, Lebofsky's litany of allegedly adverse employment actions, alone or in combination, fail to amount to employer conduct that could be described as severe or pervasive.

after that time.  Summary judgment must be granted on Lebofsky's claim of retaliation.

E. Constructive Discharge

Lebofsky also claims that his hostile work environment caused his constructive discharge.[45]  Constructive discharge "occurs when an 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Spencer v. Walmart*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984)).  A hostile work environment "will not always support a finding of constructive discharge." *Id.* (quoting *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002)).  "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* (quoting *Landgraf v. USI Film Prods*, 968 F.2d 427, 430 (5th Cir. 1992)).

As Lebofsky has failed to establish that he was subjected to conditions sufficient to establish a hostile work environment, it follows that these same facts are insufficient to meet the greater severity and pervasiveness requirements to establish a constructive discharge. *See Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163 (3d Cir. 2001) (rejecting a constructive discharge claim based on a pattern of conduct that included being passed over for a promotion, supervisors refusing to cooperate with the plaintiff, harassment, exclusion from meetings and training seminars, removal from committees, supervisor's derogatory remarks about the plaintiff's age and the resulting deterioration of her health based on this treatment).  Again, considering the

---

[45] He has now conceded that the date of his alleged constructive discharge was March 7, 2001, the date he gave notice of his intent to leave the law department, not April 5, 2001, as stated in his complaint.

41

evidence in the light most favorable to Lebofsky, I conclude that no reasonable finder of fact asked to consider the litany of real or perceived slights suffered by Lebofsky, alone or collectively, could conclude that he suffered under conditions that could be objectively described as being so intolerable that he had no course but to quit. *Gray*, 957 F.2d at 1083.

I also note that Lebofsky's acceptance of another position at a significantly higher salary prior to his resignation from the law department provides additional support for the rejection of his constructive discharge claim. However bad Lebofsky's situation was, he did not make known his suffering until he had a new job – one that included an almost 20 percent increase in pay – from $83,500 to $100,000, and even then he never mentioned racial discrimination. The significance of this factor in his decision to leave the law department further undermines his constructive discharge claim. *Zephr v. Ortho MacNeil Pharmaceutical*, 62 F. Supp. 2d 599, 609 (D. Conn. 1999).

## V. CONCLUSION

Having found that no reasonable finder of fact could conclude that Lebofsky was subjected to a hostile work environment, constructively discharged, or retaliated against, I must grant the defendant's motion for summary judgment.